People of State of Illinois Upon Relation of John R.
 Aldred, Appellant, v. Bertha B. Kurtz and Rosalyn
 V. Kurtz, Appellees.

Gen. No. 46,335.

Opinion filed June 3, 1954. Released for publication June 29, 1954.

YAFFE & YAFFE, of Chicago, for appellant; J. E. YAFFE, of Chicago, of counsel.

ROBERT J. COLLINS, of Chicago, for appellees.

` MR. JUSTICE ROBSON delivered the opinion of the court.

John R. Aldred, relator, hereinafter called plaintiff, filed his verified petition for writ of habeas corpus as the sole surviving parent, for the custody of his son Michael Clayton Aldred, age nine, against the son's maternal grandmother, Bertha B. Kurtz, and maternal aunt, Rosalyn V. Kurtz, as respondents and defendants. The writ was returnable on August 17, 1953, during the summer vacation period of the courts in Cook county and came on for hearing before the judge assigned for emergency matters. By agreement of the parties, it was referred to a master in chancery to hear the evidence and report to the court. The master after a complete hearing recommended that the child be returned to his father. The trial court, on the basis of the transcript of the evidence `and reports of the Cook County Department of Welfare and the Department of Public Welfare of Prince William County, Virginia, entered an order denying the writ and granting custody of Michael Clayton Aldred to Bertha B. Kurtz and Rosalyn V. Kurtz. Plaintiff appealed from this order.

█ The law is well established that a parent has a right to the custody of his child against all the world unless he has forfeited that right or the welfare of the child demands that he should be deprived of it. *Kulan v. Anderson,* 300 Ill. App. 267; *Stafford v. Stafford,* 299 Ill. 438; *Sullivan v. People,* 224 Ill. 468; *Cormack v. Marshall,* 211 Ill. 519.

█ Unless the unfitness of the parent is established by clear evidence, fitness will be presumed and the custody of the child will be awarded to the parent. *Kulan v. Anderson, supra; Cormack v. Marshall, supra; Wohlford v. Burckhardt,* 141 Ill. App. 321.

The salient facts of the record in this case reveal that the plaintiff was married to Shirley L. Kurtz, the daughter and sister of the defendants, on July 3, 1942. On October 24, 1943, Michael Clayton Aldred was born. His mother died shortly thereafter. Plaintiff was then in the United States Army. He placed the child in the care of defendant Bertha B. Kurtz, the grandmother. The child lived with her until he was about six and one-half years old. During all this time plaintiff paid $65 a month for his child's support. While he was in the service and stationed in this country he visited the child very frequently. He was discharged from the service in 1946. He informed defendants that he desired to finish his education at Michigan State College. By agreement the grandmother continued to have the care of the child but the father visited him frequently. While at college he met his present wife and married her in 1947. He graduated and received two degrees, one Bachelor of Science in Agriculture, the other, Doctor of Veterinary Medicine. After attaining his degrees the plaintiff established a home for himself and his wife in Haymarket, Virginia, on a 453-acre dairy farm, which is owned by his present wife's mother and which he manages. He established his practice in veterinary medicine in this same community. He

569

built a modern home with all modern facilities. In the early part of 1950 he asked the grandmother to bring the child to his home. After some delay, the grandmother reluctantly brought the son to the plaintiff at the farm in May of 1950. The plaintiff, who is now 37, and his wife, who is age 27, have had two children, both girls, one three years old, the other one year old. When he came to Virginia, Michael was given his own room and attended public school in Haymarket, Virginia, which is about seven miles from the farm. There are tenants on the farm who have children of Michael's age with whom he plays. The father gave him a pony, two dogs and a bicycle. He was given a calf to raise. It is apparent that the father did everything in a material way to make Michael's life a pleasant one.

The defendants visited Michael in August of 1950, March of 1951, April of 1952, July of 1952, and October of 1952, with the consent and at the invitation of plaintiff and his wife. At times they stayed with plaintiff. Plaintiff sent Michael to Chicago in the summer of 1951 to visit with the defendants. In June of 1953 defendants requested plaintiff to permit Michael to come to Chicago for a summer vacation. Plaintiff agreed to it. The vacation was delayed at Michael's request until after a rodeo in Haymarket, Virginia. After this Michael went to Chicago where he was to stay about two weeks. At the expiration of that period, he did not return and plaintiff wrote and called by long distance to find out why the boy had not been returned to his home. Defendants informed plaintiff that the boy refused to come home because he was cruel to him. Plaintiff came to Chicago and in an effort to work the problem out amicably he agreed with defendants to go to a psychiatrist. Plaintiff, defendants and Michael were examined by the psychiatrist. The recommendation of the psychiatrist was that it would be best for the boy to live with his own father. Re-

spondents were dissatisfied with the doctor's report and refused to surrender the boy. Plaintiff then filed the present proceedings.

The master conducted extensive hearings. Plaintiff testified, respondents testified, Michael testified, plaintiff's wife testified. Pictures taken on the farm of Michael, of plaintiff, and members of plaintiff's family indicating a happy home life were received in evidence. The report of the psychiatrist by agreement was introduced in evidence. The report cards of the school that the boy attended were introduced in evidence. ·

The record reveals that during the three years Michael was with his father, on eight occasions he was chastised. Several incidents were shown where the father lost his temper. The record clearly reveals that Michael when he came to his father in 1950 was a spoiled and difficult child to manage. His report cards when he first started school confirmed this. A gradual improvement in the three years that he was with his father is shown by the report cards of the school.

On the basis of the testimony and exhibits the master concluded that plaintiff was entitled to the custody of his son. When the report of the master was brought to the trial court, the court was critical of the fact that it had been referred to a master. It was agreed by the parties, however, that the court should base its decision on reading the record. In addition, it was agreed that an investigation would be made by the Department of Public Welfare of Prince William County, Virginia. There is some dispute as to whether or not there was an agreement that the Cook County Department of Welfare should make an investigation, but it is not necessary for us to pass on this. However, an investigation was made in Virginia and one by the Cook County Department of Welfare. The report from Virginia reveals that Michael's teachers were interviewed, as were the family doctor and the mayor of Haymarket.

The consensus was that when Michael came to his father's home he was spoiled and presented many behavior problems; that the plaintiff and his wife were kind, considerate and understanding; that plaintiff had had numerous conferences with Michael's teacher as to methods for retraining him for normal boyhood and that his present wife also showed a very genuine interest in him. The report in fact is very laudatory of the home life provided by plaintiff.

The report of the Cook County Department of Welfare revealed a strong attachment between the two defendants and Michael; that they had refused to allow the boy to return to the plaintiff because of the claimed punishment inflicted upon him by his father; that the boy desired to stay with them. The report reveals that when he attended school he was a difficult child. A report of a doctor attached to the report of the Department of Welfare shows that there are psychological difficulties. The doctor's report concludes: "With the grandmother and aunt he is entirely in a grown-up distorted world, will not make friends with his peers, learn to adjust to school, and will not get the intensive psychotherapy he needs." The doctor recommends intensive treatment and a possible placement of the child with outside interests. The report of the Cook County Department concurs with the doctor's recommendation.

On the basis of the record before the master, the report of the Department of Public Welfare of Haymarket, Virginia, and the report of the Department of Welfare of Cook County, together with the doctor's report, the trial court concluded that the defendants should have the custody of the child and denied plaintiff's petition.

 In applying the law to the facts of this case, we must bear in mind that this father never surrendered the custody of his child to anyone. The custody

the defendants had at one time was entirely vicarious. Indeed, at the time they refused to return the child to the plaintiff the child was with them solely as a visitor and there was not the slightest basis in law for their claim to his custody. The fact that the father had entrusted the child to them for a short period at their request imposed upon the defendants, in our opinion, a greater duty to see that he was promptly returned when the father requested it. Instead they involved the father and child in extensive litigation in a forum far from their home. We realize that defendants developed a great love and affection for the child but that love should have been directed to the acceptance by the boy of his father and his home which they knew had been made difficult through no real fault of the father. There is a showing that the plaintiff was possibly at times too severe in his punishment of the child and may not have been as sympathetic in correcting his faults as he might have been, but such acts did not constitute cruel and inhuman treatment. The record in fact reveals that the father, a well-educated man of substantial means, and his wife, have a fine home with surroundings any boy should enjoy. His good qualities are shown in the way he allowed defendants to visit the child when in fact the record indicates it was possibly not to the boy's best interests. In *Kulan v. Anderson, supra,* p. 277, the court stated:

"The rule that a parent has the right to the custody of his child against all the world, unless he has forfeited that right, was born of the natural desire of mankind to create and maintain a home; and, as has been often said, the home is the foundation of society and civilization. Deprive worthy parents of their natural right to the custody of their children, where they have not forfeited that right, and you undermine the home."

This is particularly applicable in the case before us.

573

 There is no clear and convincing proof in this record that would justify a court in depriving the father of the custody of his child.

The order of the trial court is reversed and the cause remanded with directions to issue the writ and return the child, Michael Clayton Aldred, to his father, the relator and plaintiff in this cause. The judgment for master's fees entered against the relator is reversed and judgment entered against the respondents, Bertha B. Kurtz and Rosalyn V. Kurtz, for said master's fees and all costs in this cause.

*Order reversed and cause remanded with directions.*

SCHWARTZ, P. J., concurs.
TUOHY, J., took no part.